# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### HELENA DIVISION

JOHN H. SCHIPP, Administrator of the                                    PLAINTIFFS
Estate of Jerome Neufelder, Deceased, and
KENNETH BRACY and JOCELYN BRACY

v.                                        No. 2:03CV00175 JLH

GENERAL MOTORS CORPORATION and
ANN KENNEDY                                                             DEFENDANTS

ANN KENNEDY                                                        CROSS-PLAINTIFF

v.

GENERAL MOTORS CORPORATION                                       CROSS-DEFENDANT

## OPINION AND ORDER

Ann Kennedy has filed a crossclaim against General Motors in which she alleges that the

accident at issue in this case was caused by a defect in the pickup truck that she was driving when

the accident occurred.  Her lawyers have engaged Drs. Jahan Rasty and Dale Wilson as expert

witnesses to testify regarding the alleged defect.  General Motors has moved to exclude the testimony

of Rasty and Wilson pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113

S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and for summary judgment.  Both parties have submitted

affidavits and deposition transcripts, thoroughly briefed the issues, and presented evidence and

argument at a *Daubert* hearing.  After careful consideration of the evidence and arguments, the Court

excludes the testimony of Rasty and Wilson as unreliable but denies summary judgment in favor of

General Motors.

## I.

On July 24, 2002, Kennedy was driving a 2001 Chevrolet Silverado westbound on Interstate

Highway 40 when she lost control of the vehicle, crossed the center median, and struck two other

vehicles.  Kennedy testified that the Silverado began weaving, that she suddenly lost the ability to control the direction of the vehicle, and that the vehicle then shot across the median.  Her husband, Thomas Kennedy, who was in the vehicle with her, testified that he saw the right front fender go down and then come up.  Next, he saw the left front fender go down "markedly," followed again by the right side.  He testified that each time a side went down, it went down further and "got worse."  He testified that when the right side went down, the front end of the Silverado moved toward the right; when the left side went down, the front end of the vehicle moved towards the left.  Mr. Kennedy told his wife during this process not to oversteer, but after the right dip, left dip, and another right dip, the vehicle "took off across the median."

Kennedy claims that her vehicle's left torsion bar adjuster, which is part of the suspension system, was defective.[1]  A suspension system functions to isolate vehicle occupants from road surface irregularities and, although it is distinct from the steering system, contributes to the ride and handling characteristics of the vehicle.  The Silverado's front suspension system was a torsion bar suspension system.  The torsion bar, which is a steel or steel composite shaft, functions as a spring in the suspension system and controls the vertical position of the suspension.  It is connected from a lower control arm to an adjustable mount at the torsion bar cross member.  A hexagonal hole of the lower control arm accepts the hexagonal-shaped front end of the torsion bar; the torsion bar adjuster receives and secures the hexagonal-shaped back end of the torsion bar; and the torsion bar cross member houses the torsion bar adjuster.  The torsion bar adjuster allows adjustment of the ride height of each side's front suspension in order to ensure level height at rest.

---

[1] She also alleges that the vehicle was defective in other unspecified ways.  *See* ¶ 15 of Kennedy's crossclaim.  Document #47.

Either before or during the accident, the left-side torsion bar adjuster was broken into two pieces along a vertical plane at the six o'clock and twelve o'clock positions of the hexagonal hole. A piece of the fractured torsion bar adjuster in the shape of a "y" was recovered; the remaining "u" shaped piece was never found.[2]

The experts disagree as to how and when the torsion bar adjuster broke. General Motors' experts say that it broke due to impact forces from the accident. Kennedy's experts, Rasty and Wilson, say that some unspecified manufacturing or material defect in the torsion bar adjuster induced a fracture along the hexagonal hole which, in turn, caused the torsion bar adjuster to break under normal operating forces. Rasty and Wilson say that the fracture originated in the lower portion of the torsion bar adjuster at the six o'clock position of the hexagonal hole. According to their testimony, the torsion bar adjuster was completely fractured at the six o'clock position of the hexagonal hole and partially fractured at the twelve o'clock position for a significant period of time before the accident, at least weeks but possibly months, and that the torsion bar adjuster completely fractured at the twelve o'clock position immediately before the accident, which caused the torsion bar adjuster to break into two pieces. Rasty offers the additional opinion that the fracture at the twelve o'clock position caused the accident. He says that the final fracture of the torsion bar adjuster meant that the torsion bar adjuster would no longer support the weight of the truck, which shifted the center of gravity of the truck to the left and caused Kennedy to lose control.[3]

---

[2] Photographs of the torsion bar adjuster are attached to this opinion.

[3] At the *Daubert* hearing, Kennedy conceded that Rasty is not qualified to opine that the fracture of the torsion bar adjuster caused Kennedy to lose control. Kennedy argued that whether the fracture of the torsion bar adjuster would cause her to lose control is nevertheless a jury question.

## II.

Rasty is an associate professor of mechanical engineering at Texas Tech University. He teaches mechanical metallurgy and fracture and failure analysis, among other things. Wilson is a professor of mechanical engineering at Tennessee Tech University. He researches in the areas of fracture analysis and failure mechanics, among other things. Except for Rasty's qualification to opine that the fracture of the torsion bar caused the accident, General Motors does not dispute the qualifications of Rasty and Wilson to testify as experts in the area of failure analysis. General Motors does, however, contend that their testimony should be excluded under *Daubert*.

"The opinion of a qualified expert witness is admissible if (1) it is based upon sufficient facts or data, (2) it is the product of reliable principles and methods, and (3) the expert has applied the principles and methods reliably to the facts of the case." *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1057 (8th Cir. 2005) (citing FED. R. EVID. 702). The inquiry "entails a preliminary assessment of whether the reasoning or methodology underlying the testing is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93, 113 S. Ct. at 2796. "Ordinarily, a key question to be answered . . . will be whether [a theory] can be (and has been) tested." *Id*. at 593, 113 S. Ct. at 2796. Scientific methodology is "based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Id*. (internal quotation marks and citations omitted). Other factors may include: whether the theory has been subjected to peer review and publication; what the known or potential rate of error is; the existence and maintenance of standards controlling the technique's operation; whether the theory has received "general acceptance" in the relevant scientific community, whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert

ruled out alternate explanations; and whether the expert sufficiently connected the proposed testimony with the facts of the case.  *Id*. at 593-94; 113 S. Ct. at 2797; *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 687 (8th Cir. 2001).  The inquiry is flexible, but the focus is always on the principles and methodology used by the proffered expert, not on the conclusions generated.  *Daubert*, 509 U.S. 594-95, 113 S. Ct. at 2797.

The gatekeeping obligation that Rule 702 imposes on the district court applies to all expert testimony, including that of engineers, not merely to "scientific" testimony as distinct from "technical" testimony.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).

The ASM Handbook, an authoritative publication by ASM International,[4] outlines the principal stages of a failure investigation and analysis as follows:

- Collection of background data and selection of samples
- Preliminary examination of the failed part (visual examination and record keeping)
- Nondestructive testing
- Mechanical testing (including hardness and toughness testing)
- Selection, identification, preservation, and/or cleaning of all specimens
- Macroscopic examination and analysis (fracture surfaces, secondary cracks, and other surface phenomena)
- Microscopic examination and analysis
- Selection and preparation of metallographic sections
- Examination and analysis of metallographic sections
- Determination of failure mechanism
- Chemical analyses (bulk, local, surface corrosion products, deposits or coatings, and electron microprobe analysis)
- Analysis of fracture mechanics
- Testing under simulated service conditions (special tests)
- Analysis of all the evidence, formulation of conclusions, and writing the report (including recommendations).

---

[4] ASM International is a professional organization for those who work with metals, composites, ceramics, polymers, and electronic materials.

D.A. Ryder et al., *General Practice in Failure Analysis*, *in* 11 ASM HANDBOOK (William T. Becker et al. eds., 2002). Rasty testified that investigations differ according to circumstances and that an engineer might not complete every stage in any particular investigation. Still, these steps define the general practice in failure analysis and represent a reliable method of failure investigation and analysis. *Cf. Fireman's Fund*, 394 F.3d at 1057-58 (citing *Daubert*, 509 U.S. at 594, 113 S. Ct. at 2797).

Rasty's opinion is based primarily on visual examination. The lower arm fracture surface appears corroded and is darker in color than the upper arm fracture surface. Rasty opined that the surface of the torsion bar adjuster arm at the six o'clock position was rust, which meant, he said, that the surface of the fractured area had been exposed to the elements for a significant period of time before the accident. A small segment of apparent corrosion is found at the fracture at the twelve o'clock position, which according to Rasty, means that a small fracture at the twelve o'clock position existed a significant time before the accident. Rasty opined that the torsion bar fractured completely at the twelve o'clock position just before the accident, which in turn caused the weight of the vehicle to shift to the left, as a result of which Kennedy lost control. In addition to the corrosion on the fracture surface at the six o'clock position and on a small portion of the fracture surface at the twelve o'clock position, Rasty pointed to the witness marks on the torsion bar adjuster and the nature of the fracture as evidence that the fracture was caused by ordinary pressures of the torsion bar, not by the collision.

Rasty did not perform subsequent steps of failure analysis, which is to say that he did not perform steps that might disconfirm his opinion.

Rasty testified at his deposition, "if that material [on the fracture surface at the six o'clock position] is not ferrous oxide [rust] and it's predominantly dirt, you know, then basically it shoots

our – it shoots our theory basically."  Yet, he did not conduct chemical analysis of the material on the fracture surface.  Wilson and one of General Motors' experts, Thomas Proft, analyzed the surface of the fracture at the six o'clock position using a scanning electron microscope and energy dispersive spectroscopy, which allows the determination of the chemistry of materials observed in the microscope.  It is undisputed that the chemical composition of the material on the fracture surface is typically found in dirt.  In fact, Proft analyzed a sample of dirt from the scene of the accident and found that the chemical composition of that dirt matched the chemical composition of the materials found on the fracture surface of the torsion bar adjuster.  The material on the fracture surface is not predominantly rust.

For purposes of the *Daubert* motion, the important point is not that Rasty's opinion was wrong; the important point is that he did not do the chemical analysis that could confirm or disconfirm his theory.  That analysis is one of the steps in general practice in failure analysis, according to the ASM Handbook.  Rasty's failure to perform that step in the analysis leaves his opinion – that the material on the fracture surface at the six o'clock position is rust – unreliable.

Rasty opined that the torsion bar adjuster was defective.  He did not specify the nature of the defect.  He did say that the defect must have been present at the time the vehicle left the manufacturer.  The evidence showed that this opinion can be tested.  The evidence showed that it is feasible to use metallographic sectioning to analyze the material in the torsion bar adjuster to determine the presence or absence of inherent material flaws.  Proft performed this analysis and found what one would expect for properly cast ductile iron of the type used in making the torsion bar adjuster.[5]  According to Proft, the images showed no casting defect, porosity or shrinkage

---

[5] At the *Daubert* hearing, Rasty testified on examination by Kennedy's lawyer that the torsion bar adjuster was made of cast steel.  When told by General Motors' lawyer that it actually

problems, high temperature oxide, or anything else indicative of a material or manufacturing flaw. Instead, the features indicated what he called a "rapidly running, single-cycle" overload fracture, that is, a fracture caused by stress imposed above the tensile strength of the material.

Again, for purposes of the *Daubert* motion, the significance of this examination is not the conclusions drawn from it by Proft. The significance is that such an examination is part of general practice in failure analysis. Such analysis is necessary to the formation of a reliable opinion; yet, Rasty did not perform it. He did no metallographic sectioning. He testified that he was told that he could not perform destructive testing. In December 2004, the Court entered an agreed order that prohibited destructive testing except by agreement of the parties or a subsequent order. General Motors sought and obtained (over Kennedy's objection) a court order permitting destructive testing. Kennedy never sought an agreement or an order to permit Rasty to perform the same testing. Rasty was invited to attend the examination performed by Proft, but he did not go. Kennedy could have sought and would have obtained agreement from the other parties or a court order to allow Rasty to perform metallographic sectioning but did not. For whatever reason, Rasty did not perform the step, which is part of the general practice in failure analysis. His opinion is unreliable.

One of the key issues surrounding Rasty's opinion in this case is whether a torsion bar adjuster with a complete fracture at the six o'clock position of the hexagonal hole and a partial fracture at the twelve o'clock position could sustain the weight of the Silverado for any amount of time without breaking. Rasty's opinion assumes that a torsion bar adjuster fractured at the six o'clock position of the hexagonal hole can support the weight of the vehicle for weeks or months.

---

is made of ductile iron, Rasty said, "it's in the iron family is what I meant" and "I misspoke on that."

The evidence shows that the issue of whether a fractured torsion bar adjuster would support the weight of the vehicle could be analyzed in two ways.  First, mathematical calculations can provide evidence of whether it is possible for a fractured torsion bar adjuster to sustain the weight of the vehicle.  Second, the installation of a torsion bar adjuster severed at the six o'clock position on a Silverado can provide evidence of whether the torsion bar adjuster will support the weight of the vehicle.  General Motors' experts did both of these things.  They performed mathematical calculations that purport to show that a fractured torsion bar adjuster will not sustain the weight of a Silverado.  They also severed a torsion bar adjuster at the six o'clock position and installed it on a Silverado.  The torsion bar adjuster snapped as soon as the weight of the vehicle was placed on it.

Rasty disputes the calculations performed by the General Motors expert, which he says are based on the assumption that the torsion bar adjuster is a straight member, whereas in reality it is a curved member.  He also cites "a number of errors" made in the analysis.  Yet he did not offer calculations based on the assumption that the torsion bar adjusting arm is a curved member.  Rasty says that the calculations of General Motors' expert "do not demonstrate that it is a mathematical impossibility that the torsion bar adjuster could retain the hexagonal end of the torsion bar with the bottom half of the hexagonal loop of the torsion bar adjuster severed."  For purposes of this motion, we assume that Rasty is correct – the calculations offered by General Motors do not show that it is mathematically impossible for a severed torsion bar adjuster to support the weight of the vehicle.  However, for purposes of the *Daubert* motion, the important point is that Rasty did not perform calculations to show that it is mathematically possible for a fractured torsion bar adjuster to support the weight of the vehicle.  His opinion assumes that it is possible for a torsion bar adjuster fractured at the six o'clock position of the hexagonal loop to support the weight of the vehicle for a significant

period of time – long enough for rust to form on the surface of the fracture – but he did no calculations to determine whether that is possible.

Nor did he perform a test by fracturing an adjuster at the six o'clock position and installing it on a Silverado.  It should be an easy test to perform.  Rasty testified that he thought of performing the test but could not find a vehicle comparable to Kennedy's 2001 Silverado.  It is difficult to believe that Rasty could not find a Silverado in or around Lubbock, Texas, where he lives, or that Kennedy's lawyers, who practice in Memphis, Tennessee, could not find one.  Even if it is true that Rasty could not find a Silverado of the same generation as the 2001 model, the fact remains that Rasty's opinion in this case rests on a significant assumption – that a torsion bar adjuster fractured at the six o'clock position of the hexagonal loop could support the weight of a pickup truck – and Rasty has not tested the assumption in any manner.

To summarize, Rasty's opinions rest largely on visual examination.  General practice in failure analysis, as reflected in the ASM Handbook, requires further testing.  In this instance, such testing would include chemical analysis of the materials on the fracture surface using scanning electronic microscope analysis, metallographic sectioning, and testing under simulated conditions to see whether a fractured torsion bar adjuster would support the weight of the vehicle.  Rasty performed none of these tests.  In essence, he adopted a hypothesis but failed to test it.  His opinions are therefore unreliable.  His testimony is excluded.

Wilson, who did perform chemical analysis, testified that the deposits on the fracture surfaces are predominately something other than rust and that only faint traces of rust existed.  According to him, for the most part, these deposits "appear to be just deposits" and are "not corrosion products." This fact did not alter Wilson's opinion because his opinion depended more on his belief that the deposits, whatever they are, would have taken weeks or months to form.  Wilson conducted no

testing to confirm this belief; he relied solely on his past experience of examining fracture surfaces. Wilson also was aware that whether a fractured torsion bar adjuster would support the weight of the vehicle was a critical issue, but he did nothing to determine whether his assumption that a fractured torsion bar adjuster would support the vehicle was true.  Wilson discussed the issue with Kennedy's accident reconstructionist but, as he stated at his deposition, he doesn't "think we have ever known [the answer] one way or the other."  Wilson admits that he was capable of calculating the amount of force a fractured torsion bar adjuster could withstand if he was provided the proper data, but that he has not performed those calculations.  He testified at one point in his deposition that he began performing them but "ended up seeing that I was doing that for a Dodge truck instead of . . . so the dimensions weren't – I didn't have the correct dimensions."  Elsewhere, he testified that he had not performed them because he hadn't been asked to.  Wilson testified that Kennedy's team had also tried to set up a physical experiment to test this issue but that they "didn't have the capacity to do that experiment."

In short, Wilson's opinion suffers from the same lack of testing as Rasty's.  His testimony will be excluded.

### III.

A court should enter summary judgment if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 850 (8th Cir. 2005).  The party moving for summary judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

If the moving party carries its burden, the nonmoving party must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1985) (quoting FED. R. CIV. P. 56(e)) (emphasis in original). A genuine issue for trial exists only if there is sufficient evidence to allow a jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511. When a nonmoving party cannot make an adequate showing on a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552. The Court is required to view the facts in the light most favorable to the nonmoving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *United States v. Friedrich*, 402 F.3d 842, 845 (8th Cir. 2005).

A supplier of a product is liable for damages when the product supplied was in a defective condition that rendered it unreasonably dangerous and the defective condition was a proximate cause of the harm. ARK. CODE ANN. § 4-86-102. Expert testimony is not necessary in every product liability case. *Dancy v. Hyster Co.*, 127 F.3d 649, 653 (8th Cir. 1997) (stating Arkansas law). "Strictly speaking, since proof of negligence is not an issue, res ipsa loquitur has no application to strict liability; but the inferences which are the core of the doctrine remain, and are no less applicable." *Higgins v. Gen. Motors Corp.*, 287 Ark. 390, 699 S.W.2d 741, 743 (1985). "Consequently, '[p]roof of a specific defect is not required when common experience teaches the accident would not have occurred in the absence of a defect.'" *Dancy*, 127 F.3d at 653 (quoting *id.*). That said, "[t]he mere fact of an accident, standing alone, as where an automobile goes into the ditch, does not make out a case that the product was defective, nor does the fact that it was found in a defective condition after the event, where it appears equally likely that it was caused by the accident

12

itself." *Harrell Motors, Inc. v. Flanery*, 272 Ark. 105, 108, 612 S.W.2d 727, 729 (1981). "Generally

speaking, when a vehicle suddenly goes out of control while being operated, driver error is a likely

cause, absent a reliable explanation in the alternative."   *Yielding v. Chrysler Motor Co.*, 301 Ark.

271, 275, 783 S.W.2d 353, 355 (1990).  Relevant then is the extent to which the plaintiff has negated

other possible causes.  *Dancy*, 127 F.3d at 653.

As noted, Kennedy testified that the Silverado began weaving and then, after she lost control

of the steering, suddenly shot across the median.  Her testimony was not that the vehicle pulled to

the left; her testimony was that she would turn the steering wheel but the wheels would not respond.

The relevant portion of her testimony is as follows:

Q      . . . . So you're driving down the road and we're getting pretty close to where the accident is going to happen.  What is the first thing you notice that made you concerned or was out of the ordinary?

A      Just that we were kind of weaving on the road.

Q      Okay.

A      And I couldn't – I had both hands on the steering wheel.  And when I would turn the steering wheel, I had no control over how the direction the vehicle was going and no control over the steering wheel, the steering at all.

Q      And did that happen just out of the blue?

A      Just out of the blue.

Q      You don't recall hitting anything or making an evasive maneuver or anything like that?

A      No, I do not.

Q      Did you hear any noises?

A      No.

Q      Okay.  And I assume –

A       Not that I remember.

Q       You will have heard some noises once the accident scenario was happening and you are colliding with things, but –

A       Yes.

Q       But as far as when you experienced this inability to steer the vehicle, there was no noise, no –

A       Not that I remember.

Q       Okay.  And did you – did you make any comment or remark when you first experienced this phenomenon of not being able to control the steering?

A       The only thing that I remember is my husband saying, don't over steer.  And I said, I'm not.  I just had no control over it.  And then, the next thing I know, we were shooting across the median.  And I remember say, oh, no.  And –

Q       The – this absence of ability to control the steering, was that during the time that you're shooting across the median?

A       No.  Prior to it.

Q       Before?

A       Prior.

Q       And so, is it your belief that you went from the outside lane through  the inside lane –

A       Yes.

Q       – to get to the median?  Okay.  Didn't hit anything at this point?

A       No.

Q       How – what is your best estimate of how long you experienced this inability to control the steering wheel before you hit the median?

A       A matter of seconds probably.

Q       Very, very fast?

A       I don't know.  Somewhere – you know, those things just happen so fast, you can't even tell.  30 to 60 seconds, I would guess.  It wasn't long at all.  Didn't have time to think about how to correct the situation.

Q       Do you recall your husband making any other comment other than don't over steer?

A       No, I don't.

* * *

Q       I hate to go back through the actual accidents again, because I know it is difficult for you.  But now let [me] make sure I'm understanding.  The inability – the inability to steer is what I want to ask you another question about.  Are you telling me that you were able to turn the steering wheel and it simply did not control the wheels, or you were not physically able to turn the steering wheel?

A       I believe that I was able to turn the steering wheel, but nothing was responding.

Q       So you think you were able to turn the steering wheel to the right and to the left –

A       And was getting no response.

Q       – and that action was simply not having an effect on the front wheels?

A       That's correct.

Mr. Kennedy testified that he witnessed the front fender drop, once on the right, once on the left, and then again on the right.  Mr. Kennedy testified that the direction of the vehicle would move in the direction of the side which dropped.  Right before the car "took off across the median," Mr. Kennedy told his wife not to oversteer.  Even if Rasty and Wilson were permitted to testify that the torsion bar adjuster snapped shortly before the accident, there is no evidence that the failure of the torsion bar adjuster would cause the vehicle to move in the manner described by either of the Kennedys.

Failure mode analyses by General Motors lists as potential effects of a failed torsion bar adjuster, among other things, "ride degradation" and "potential steer input."  David Wood, an expert for General Motors, testified in his affidavit that:

> [i]f a torsion bar or a torsion bar adjuster were to break, the vertical "at rest" height of the affected wheel position would no longer be maintained.  That wheel position's suspension would "drop" to a fully deflected position, and the lower control arm would come to rest (or "bottom out") against a urethane jounce bumper.  The jounce bumper would then be carrying the vertical load (instead of the vertical load being converted to a twisting torque in the torsion bar).  This would result in the affected corner of the vehicle riding significantly lower than the normal "at rest" position.  This change in height would be approximately four to five inches with no load in the vehicle, and the vehicle would "lean" approximately four to five degrees towards the affected side as a result.  A small steering torque (or pull) could occur as a result; however, this would not change the driver's ability to steer and to control the vehicle's path.

Kennedy initially offered Rasty's opinions as to what impact the alleged failure would have on Kennedy's driving.[6]  At the *Daubert* hearing, however, Kennedy agreed that Rasty was not qualified to testify as an expert on the issue of the Silverado's handling and stability.  No one then has stated that a failure of the torsion bar adjuster would cause Kennedy's Silverado to take off uncontrollably to the left as Kennedy described or to cause the front fenders alternatively to go up and down as her husband described.  *Cf. Higgins*, 287 Ark. at 394, 699 S.W.2d at 744.  Wood's testimony that a failure of the torsion bar adjuster would not change the driver's ability to steer is undisputed.

---

[6] Rasty testified that a defective torsion bar adjuster would "affect the handling of a vehicle and more likely than not create a risk of a loss of control when [it] failed."  He opined that complete fracture of the left torsion bar adjuster in a vehicle traveling 60 to 70 miles per hour (the speed that Kennedy was traveling) and maneuvering a right curve, would "result in the sudden drop in height of the left side of the vehicle, which in turn would cause the momentum of the vehicle to suddenly shift to the left creating a sudden pull to the left."  According to him, this sudden drop and pull would result in a loss of control of the vehicle and the vehicle would veer left.

The issue, then, is whether the testimony of Kennedy and her husband suffices to defeat General Motors' motion for summary judgment. For purposes of ruling on the motion for summary judgment, the Court is obligated to assume that the sworn testimony of Kennedy and her husband is true. *Jonnson v. Univ. of Iowa*, 431 F.3d 325, 329 (8th Cir. 2005). If that testimony is true, driver error is negated; and, if that testimony is true, a nearly new Silverado experienced some failure in the steering mechanism while Kennedy was driving at 65 miles per hour on an interstate highway.

In *Higgins*, the Arkansas Supreme Court stated, "We note that under appropriate circumstances, a user's testimony alone may be sufficient evidence." *Higgins*, 287 Ark. at 392, 699 S.W.2d at 743. In support of that proposition, the court cited, among other authorities, *Stackiewicz v. Nissan Motor Corp. in U.S.A.*, 686 P.2d 925 (Nev. 1984). In *Stackiewicz*, the plaintiff and her mother testified that, as they were driving at 50-55 miles per hour, the steering wheel locked and would not turn, which caused an accident. Plaintiff's counsel "retained various experts who were unable to find a defect in the steering mechanism." *Id*. at 927. A jury returned a verdict for the plaintiff. The trial court granted judgment notwithstanding the verdict. The Supreme Court of Nevada reversed saying, "evidence of a steering malfunction which resulted in the driver losing control of the vehicle might properly be accepted by the trier of fact as sufficient circumstantial proof of a defect, or an unreasonably dangerous condition, without direct proof of the mechanical cause of the malfunction." *Id*. at 929. Other courts, presented with a steering malfunction and similar proof, have ruled in line with *Stackiewicz. See Stewart v. Ford Motor Co.*, 553 F.2d 130, 140 (D.C. Cir. 1977) ("Plaintiffs were entitled to ask the jury to infer that the accident was caused by some unknown defect which caused the steering system to malfunction."); *Buckley v. Gen. Motors Corp.*, 2004 WL 725933 (S.D.N.Y. 2004) (Plaintiff's testimony that the vehicle veered in a direction she did not steer and failed to slow when she applied the brakes avoided summary judgment even though

17

her expert was excluded.); *Dennis v. Ford Motor Co.*, 332 F. Supp. 901, 903 (W.D. Pa. 1971), *aff'd*,

471 F.2d 733 (3d Cir. 1973) ("If he is unable by expert testimony to pinpoint the defect he can still

fall back on the fact of malfunction as evidence of a defect."); *Millette v. Radosta*, 404 N.E.2d 823,

835 (Ill. App. Ct.  1980) ("Radosta testified that the steering suddenly failed and the failure caused

the accident.  This testimony, alone, if believed, established that the vehicle was defective at the time

of the accident."); *Walczak v. Gen. Motors Corp.*, 340 N.E.2d 684 (Ill. App. Ct. 1976) (Plaintiff's

testimony that the steering locked in a new vehicle was sufficient.  Proof of a specific defect was not

required.); *Moraca v. Ford Motor Co.*, 332 A.2d 599 (N.J. 1975) (Plaintiff's testimony that the

steering mechanism locked on his nearly new vehicle was sufficient circumstantial evidence of a

defect.); *Caprara v. Chrysler Corp.*, 423 N.Y.S.2d 694, 697 (N.Y. App. Div. 1979) ("Plaintiff's

testimony that the steering wheel 'seized right up' and that it 'would not turn' was sufficient to

establish prima facie in strict products liability that a defect . . . existed . . . ."); *Ducko v. Chrysler

Motors Corp.*, 639 A.2d 1204, 1207 (Pa. Super. Ct. 1994) ("Mrs. Ducko's testimony of the erratic

performance of the vehicle's steering and braking systems . . . was sufficient to make a prima facie

case of a manufacturing defect in the vehicle."); *MacDougall v. Ford Motor Corp.*, 257 A.2d 676,

680 (Pa. 1969) ("Mrs. MacDougall's testimony of the bizarre steering action both before and when

the accident occurred establishes a mechanical malfunction in the absence of abnormal use which

prevented her from maintaining control of the car.").  *See also* Christopher H. Hall, *Strict Products

Liability: Product Malfunction or Occurrence of Accident as Evidence of Defect*, 65 A.L.R. 4th 346

(1988).

  General Motors relies upon an opinion by Judge Eisele in *Ruminer v. General Motors Corp.*,

No. 4:03CV00349 GTE (E.D. Ark. Feb. 6, 2006) (Document #149).  There, the plaintiff contended

that the fact that the seatbelt system did not restrain him, or did not restrain him adequately, was

sufficient to establish that the seatbelt system was defective. Judge Eisele held that, in the absence of proof of a specific defect, the plaintiff must negate other causes of the seatbelt failure. The evidence showed that a seatbelt may fail for many reasons other than a manufacturing or design defect. Judge Eisele said, "Most, if not all, of these 'potential causes' appear to occur post-manufacture." *Id*. at 9. Hence, the plaintiff did not negate possible causes other than a defect. *Id*. at 15.

Here, the present state of the evidence leaves only two alternative causes for the accident: either Kennedy lost control of the vehicle through driver error, or she lost control due to a malfunction of the steering mechanism. Her testimony, and that of her husband, if believed, negates driver error. It is for a jury to decide whether the Kennedys should be believed.

If the jury believes the testimony of Kennedy and her husband, it will find that the accident was not caused by driver error but by some sudden, unexpected malfunction in the steering mechanism of a nearly new vehicle. According to *Stackiewicz*, and the other cases cited, that evidence is sufficient circumstantial proof of a defect to permit a finding against the manufacturer. Therefore, General Motors' motion for summary judgment is denied.

## CONCLUSION

For the reasons herein, the Court grants the motion of General Motors to exclude from evidence the testimony of Dr. Jahan Rasty and Dr. Dale Wilson. Document #136. The Court denies summary judgment in favor of General Motors on Kennedy's crossclaim. Document #138. General Motors also moved for summary judgment on the plaintiffs' complaint against it. For the same reasons that the Court denies General Motors' motion for summary judgment on the crossclaim of Ann Kennedy, the Court also denies summary judgment on plaintiffs' claims against General Motors. Document #30. Kennedy's motion to strike is denied as moot. Document #153.

19

IT IS SO ORDERED this 10th day of August, 2006.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE



**Figure 23 - Broken left side adjuster (arrow) shown placed in disconnected and twisted left side of cross member.**



Figure 24 - Broken left side (top) and intact right side adjusters.



Exhibit A